772 So.2d 94 (2000)
Floyd JOSEPH
v.
BROUSSARD RICE MILL, INC., et al.
No. 00-C-0628.
Supreme Court of Louisiana.
October 30, 2000.
*97 Andrew R. Johnson, IV, Plauche, Smith & Nieset, Lake Charles, Counsel for Applicant.
Raleigh Newman, Samuel Bryan Gabb, Lake Charles, Counsel for Respondent.
KNOLL, J.
At issue before us in this personal injury case is whether the lower courts properly applied the law of judgment notwithstanding the verdict (JNOV) to the jury's finding of fault, its apportionment of that fault, and award of damages.

FACTS
Floyd Joseph (Joseph), an employee of Lake Charles Stevedores (Stevedores), worked as a longshoreman at the Port of Lake Charles (Port). Joseph was injured on November 3, 1994, working as a utility man port-side when numerous 110 pound sacks of rice fell on him in a warehouse. The sacks of rice came from the Broussard Rice Mill (Broussard) in Mermentau, Louisiana.
It is undisputed that Broussard originally filled the polyweave sacks with 110 pounds of rice and stacked them on pallets; there were 36 to 42 sacks of rice on each pallet, six sacks to a layer. To lessen the chance of having rice sacks fall, Broussard utilized a longstanding method of crosstying the rice sacks on each pallet[1] and employed an automatic gluing mechanism to inject glue between the layers of rice sacks.
Broussard shipped the stacked rice sacks on pallets from Mermentau to Lake Charles on flatbed trucks. When the rice left Mermentau it was stacked one pallet high, and, as additional security, the pallets were strapped to the bed of the truck. As the rice arrived at the Port, Stevedores hired warehousemen to off-load the rice pallets from the trucks and stack the pallets three-high in the warehouse.
On the day of the accident, rice sacks had fallen in the warehouse as longshoremen were bringing the rice pallets on forklifts to a waiting cargo ship. Stevedores hired Joseph to pick up the rice sacks that had fallen from the stacked pallets in the warehouse. As Joseph was picking up these fallen sacks, two pallets of rice suddenly collapsed, completely covering him as he stood with his back to the stacked pallets. Curtis Shuff, Jr. (Shuff) was in the warehouse at the same time moving stacked pallets of rice by forklift from the warehouse to a loading area alongside a cargo ship. Shuff came to Joseph's aid, quickly removing the sacks of rice from atop Joseph. As described by Shuff, Joseph was lying face down on the concrete floor; he was pale and, except for moans, was unresponsive. Joseph was taken to the hospital where he was treated and released. Within days of the accident, Joseph felt worse and began treatment with various orthopedic specialists. Subsequently, *98 Joseph underwent two surgeries, one to repair a hernia and another to repair several cervical discs at two levels. Later, it was determined that Joseph's bilevel cervical fusions had failed and he was further diagnosed as having thoracic outlet syndrome which may ultimately require surgical intervention. At the time of trial, Joseph had not returned to work and was suffering lower back pain as well as pain in the right knee.
Joseph filed suit against Broussard.[2] After Broussard was placed into bankruptcy, its insurer, Mutual Service Insurance Co. (MSI), was substituted as a party defendant. MSI specifically alleged Joseph's comparative fault, as well as fault on the part of the Stevedores, an unnamed defendant.[3] Stevedores and its Longshore/Harborworker's insurer, Signal Mutual Indemnity Associated, Ltd. (Signal Mutual), intervened to recover medical and indemnity payments made to and on behalf of Joseph.
A jury returned a verdict finding Joseph, Broussard, and the Stevedores at fault and awarding damages totaling $482,760.[4] It allocated fault 13.6% to Broussard, 72.4% to Stevedores, and 14% to Joseph. In accordance with the allocation of fault, judgment was rendered in Joseph's favor against MSI for $65,655.36. The trial court also recognized the intervention of the Stevedores and Signal Mutual and awarded reimbursement of $112,136.32.
On Joseph's motion for judgment notwithstanding the verdict,[5] the trial judge absolved the Stevedores and Joseph of fault, and reallocated 100% fault to Broussard. The trial judge also increased the jury's damage award from $482,760 to $1,011,743.[6]
The Court of Appeal, Third Circuit, affirmed the trial judge's JNOV on the finding and allocation of fault, but reinstated the jury's damage award except for the awards for physical and mental pain and suffering, loss of enjoyment of life, and permanent disability. Joseph v. Broussard Rice Mill, 99-1210, slip op. at 6 (La. App. 3 Cir. 2/2/00). Utilizing the manifest error standard of review, the appellate court raised these latter awards from a total of $123,275 to $225,000, finding the jury award abusively low.
We granted the writ application of MSI to consider the propriety of the lower courts' use of the JNOV procedure. Joseph v. Broussard Rice Mill, Inc., 00-0628 (La.5/5/2000), 760 So.2d 1185. For reasons which follow, we affirm the JNOV as it pertains to Joseph's assessment of fault and as to the appellate court's treatment of *99 the damage award; however, we reverse the JNOV as to Stevedores's fault.

JUDGMENT NOTWITHSTANDING THE VERDICT
LA.CODE CIV. PROC. art. 1811 controls the use of JNOV. Although the article does not specify the grounds on which a trial judge may grant a JNOV, in Scott v. Hospital Serv. Dist. No. 1, 496 So.2d 270 (La.1986), we set forth the criteria used in determining when a JNOV is proper. As enunciated in Scott, a JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. Scott, 496 So.2d at 274. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. Anderson v. New Orleans Pub. Serv., Inc., 583 So.2d 829, 832 (La.1991). This rigorous standard is based upon the principle that "[w]hen there is a jury, the jury is the trier of fact." Scott, 496 So.2d at 273; Jinks v. Wright, 520 So.2d 792, 794 (La.App. 3 Cir. 1987).
In reviewing a JNOV, the appellate court must first determine if the trial judge erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable persons in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated. Anderson, 583 So.2d at 832.

Joseph's comparative fault as an employee
Broussard contends that the lower courts erred in reversing the jury's allocation of 14% fault to Joseph. It argues that Joseph should have noticed the problem if it was obvious that the lot of rice shipped from Broussard was improperly crosstied. It further maintains that Joseph turned his back to these stacks of rice even though it presented an obvious danger and failed to notify the Stevedores that the rice sacks were falling.
This Court has clearly stated that the absolute defenses of assumption of the risk and contributory negligence are no longer viable as they have been subsumed by comparative fault principles. Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La.1988); see also Pitre v. Louisiana Tech Univ., 95-1466, 95-1487 (La.5/10/96), 673 So.2d 585, cert. denied, 519 U.S. 1007, 117 S.Ct. 509, 136 L.Ed.2d 399 (1996). Rather, where an employee takes actions pursuant to the discharge of his employment duties in the face of a known risk, which actions are reasonable in relation to those duties, then the employee is not comparatively negligent. Feurtado v. Zapata Gulf Marine Corp., 99-1510 (La.App. 4 Cir. 1/12/00), 751 So.2d 379, 383; see also Bergeron v. Blake Drilling & Workover, 599 So.2d 827, 843-44 (La.App. 1 Cir.), writ denied, 605 So.2d 1117, 1119 (La.1992). Factors considered in the determination of what is reasonable include the availability and practicability of other options. Richard v. St. Paul Fire & Marine Ins., 94-2112 (La.App. 1 Cir. 6/23/95), 657 So.2d 1087, 1091. Utilizing *100 this jurisprudence in the present case, it was incumbent upon Broussard to establish by a preponderance of the evidence that Joseph was comparatively at fault. See Terro v. Casualty Reciprocal Exch., 93-593 (La.App. 3 Cir. 2/2/94), 631 So.2d 651, 654, writ denied, 94-522 (La.4/22/94), 637 So.2d 157; Smith v. Jack Dyer & Associates, 633 So.2d 694 (La.App. 1 Cir. 1993).
It is clear that Joseph was injured while he was performing the task that his employer assigned, namely picking up fallen rice sacks at the direction of Stevedores. In order to accomplish this task, the evidence was unrefuted that Joseph had to position himself between the stacked rice pallets and the fallen sacks. The record is equally clear that although Joseph may have known that his job duties were dangerous, his only option was to refuse to perform the task he was assigned. On the other hand, Broussard presented no evidence that shows that Joseph was performing his work assignment incorrectly or with no regard for his personal safety. Joseph's actions in discharging his employment duties under the circumstances presented were clearly reasonable.
In light of the record evidence before us, we find reasonable minds could not arrive at a conclusion that Joseph was comparatively at fault. The jury apparently was persuaded by Broussard's defense which essentially was Joseph's assumption of the risk and contributory negligence.[7] This was error. We have firmly established that defenses of assumption of the risk and contributory negligence have been subsumed by comparative fault principles. Joseph was merely performing his job duties which were inherently dangerous. Broussard offered no evidence of Joseph's fault, but rather evidence of the inherent danger of his job duties. Under these circumstances, we find the trial court properly granted plaintiffs motion for JNOV, reversing the jury's allocation of fault to Joseph.

Stevedores's Fault
The jury assessed Stevedores with 72.4% fault. In their consideration of this jury finding, the lower courts rested their reversal on the failure of Broussard to present evidence in support of its assertion that Stevedores was at fault. After carefully reviewing the record, we find that the facts and inferences do not point so strongly and overwhelmingly in favor of Stevedores that reasonable persons might have reached a different conclusion.
When a defendant urges the fault of a non-party, it is incumbent upon that defendant to provide evidence which preponderates that fault actually exists on the part of the non-party. Terro, 631 So.2d at 651; Smith, 633 So.2d at 694. The common standard of proof in civil cases is a preponderance of the evidence. Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993); Succession of Lyons, 452 So.2d 1161, 1165 (La.1984). Proof by direct or circumstantial evidence is sufficient to constitute a preponderance, when taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not. Lasha, 625 So.2d at 1005; Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151, 155 (1971); see also ODECO Oil & Gas Co. v. Nunez, 532 So.2d 453, 456 (La.App. 1 Cir.1988), writ denied, 535 So.2d 745 (La.1989); Starks v. Kelly, 435 So.2d 552, 556 (La.App. 1 Cir.1983); FRANK L. MARAIST, 19 LOUISIANA CIVIL LAW TREATISE: EVIDENCE & PROOF, § 4.2 (1999). Circumstantial evidence is defined as evidence of facts or circumstances from which one might infer or conclude the existence *101 of other connected facts. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Wade, 33,121 (La.App. 2 Cir. 5/15/00), 758 So.2d 987. LA.CODE EVID. art. 302(4) defines an inference as "a conclusion that an evidentiary fact exists based on the establishment of a predicate fact." Circumstantial evidence may be as persuasive as testimonial or direct evidence in providing a compelling demonstration of the existence or nonexistence of a fact at issue. Rodgers v. Food Lion, Inc., 32,856 (La.App. 2 Cir. 4/5/00), 756 So.2d 624, 628; writ denied, 00-1268 (La.6/16/00), 765 So.2d 339; Crawford v. Ryan's Family Steak Houses, Inc., 31,911 (La.App. 2 Cir. 5/5/99), 741 So.2d 96.
In Rougeau v. Commercial Union Ins. Co., 432 So.2d 1162 (La.App. 3 Cir.), writ denied, 437 So.2d 1149 (La.1983), the Third Circuit stated:
The party against whom a motion for judgment notwithstanding the verdict is made must be given the benefit of every legitimate and reasonable inference that can be drawn from the evidence by the jury. However, the court is not bound by inferences which are unreasonable.... There is no bright line which enables the court to distinguish between the reasonable, legitimate inference and the unreasonable, illegitimate inference. There is no precise rule to follow. The court can only test the reasonableness of the inferences drawn by the jury from the evidence in terms of probability. An inference is legitimate only where the evidence offered makes the existence of the fact to be inferred more probable than not. Any lesser test would allow the jury to rest a verdict on speculation or conjecture.
Rougeau, 432 So.2d at 1167; see Ford Motor Co. v. McDavid, 259 F.2d 261, 266 (4th Cir.), cert. denied, 358 U.S. 908, 79 S.Ct. 234, 3 L.Ed.2d 229 (1958).
In the present case, Broussard contended that the fault of Stevedores rested on two contentions: first, that the stacking of rice pallets three-high was dangerous; and second, that it failed to notify Broussard that it had received a "bad lot" of rice when if off-loaded the rice pallets from the trucks which were used to transport the rice from Broussard to the Port's warehouses.
As to Broussard's first contention, it offered no evidence to show specifically how the stacking of rick pallets three-high was dangerous. The lack of specific evidence weakens this argument. A mere common-sense appreciation of the height of the stacked pallets is all that can be discerned. Moreover, the record shows that initially Keith Broussard (Keith), the owner of the Broussard Rice Mill, testified that he was unaware that Stevedores stacked the rice pallets three high in the warehouses. A careful review of the evidence, however, shows that Keith's testimony did not bear out this assertion. To the contrary, the evidence shows that Keith had visited the Port almost yearly for more than a decade and had seen that the rice pallets were warehoused three or four-high.[8] Keith further stated that he did not have problems with such stacking and that he never complained either to the Port authorities or to Stevedores about this warehouse practice. Thus, there is no record evidence to support Broussard's initial assertion. However, we find Broussard's second assertion provided a basis for which a reasonable jury could have found Stevedores *102 at fault, i.e., that reasonable minds could differ.
Broussard further contended that it was incumbent upon Stevedores to notify if the Port received rice shipments which were not properly stacked and glued. In essence, Broussard asserted that this was the Port policy. As we set out earlier, it was Broussard's burden to present evidence which would preponderate that such policy existed. Although Broussard attempted to present the expert testimony of Jules Verbenne about such policy, the trial judge sustained Joseph's objection to this testimony on the grounds that Verbenne had no personal knowledge of such policy, and had not even inquired of anyone at the Port about the existence of such policy. Nevertheless, we find other evidence from which reasonable jurors could have inferred that such policy existed and could have relied upon such evidence to support a finding that Stevedores was comparatively at fault for injuries that Joseph, its employee, sustained.
Initially, we note that the evidence shows that once the rice is delivered to the Port, Broussard loses control over the rice. This is evidenced by uncontradicted testimony that warehousemen hired by Stevedores unload and stack the rice in the warehouses and a clerk hired by Stevedores makes certain that the rice is stored in the proper warehouse. Keith further stated without disputation that Stevedores has a duty to inspect the rice pallets as they are first off-loaded from the trucks; he also testified that if the rice is not properly layered on the pallets, personnel at the Port could either return the rice shipment to Broussard for remediation or Port personnel could restack the rice pallets at Broussard's expense. Indicative of that policy was Keith's testimony that early on when the mill first began using polyweave sacks, Broussard was contacted that there was a problem with sacks slipping from the pallets when they arrived at the Port. As a result of that contact, Broussard remediated the problem by choosing to apply a bead of glue to the polyweave rice sacks as the final step before its workers crosstied the rice sacks on the pallets. Moreover, it was Keith's unrefuted testimony that once the rice is delivered to the Port, Broussard no longer owns the rice. At that point, Keith testified that the buyer of the rice requests the hiring of the labor, pays for loading the rice on the ships, and designates from which warehouse the rice is removed for shipment. Accordingly, under these circumstances, we find that reasonable jurors could have determined that Stevedores bore the brunt of the fault for Joseph's injuries because it failed to demand remediation of the rice lot from Broussard as it was removed from the trucks, and thereafter chose to stack these faulty lots of rice three pallets high in the warehouse. As such, we find that the lower courts impermissibly ignored inferences that the jury reasonably could have drawn regarding Stevedores's liability. It is clear that reasonable minds could differ and arrive at a contrary verdict. Thus, the lower courts erred in granting plaintiffs motion for a JNOV, reversing the jury's allocation of fault to Stevedores. We will reinstate the jury verdict on this issue.

Broussard's Fault
It was incumbent upon Joseph to establish by a preponderance of the evidence that Broussard was negligent and that this negligence caused his damages. See Cay v. State, Dept. of Transp. & Dev., 93-0887 (La.1/14/94), 631 So.2d 393. In his presentation of the case, Joseph contended that Broussard was negligent in failing to secure the layers with glue[9] and in improperly crosstying the rice sacks.
In finding that Broussard failed to refute Joseph's evidence in these two particulars, *103 we find that the trial court failed to recognize that the jury heard conflicting testimony on the question of gluing. Although Shuff testified that the sacks of stacked rice were sliding off the pallets at the Port because there was no glue on them, the jury heard testimony from Keith, the mill owner, that glue is mechanically applied to the rice sacks as the last stage of preparing the rice for shipment by truck to the Port. He stated that the conveyor system shuts down automatically if glue is not applied to the polyweave sacks. There was no testimony that the conveyor system stopped when this lot of rice was prepared for shipping at the Broussard mill. Likewise, Keith testified that the purpose for adding the glue was to stop the loss of rice falling off pallets in transit. Keith theorized that it probably would have been impossible for an unglued load of rice to have traveled on a flatbed truck from the mill to the Port without bags falling. In addition, Keith stated that he would have expected someone from the Port to call had an unglued rice shipment arrive in bad condition. However, there is no record of anyone notifying the mill that this shipment of rice arrived at the Port in poor condition. Accordingly, the reasonable inference which the jury could have drawn from this evidence was that glue was applied to the rice sacks which comprised this lot. As made clear in Anderson, the trial court should not evaluate the credibility of witnesses, and all reasonable inferences or factual questions should be resolved in favor of the nonmoving party. Anderson, 583 So.2d at 832. Thus, we find that the lower courts improperly concluded that JNOV was proper on this highly controverted factual question.
On the other hand, the jury heard the testimony of Gary Nelson, Joseph's expert in the field of safety engineering and safety management, that the multiple incidents of falling rice on the day of Joseph's accident indicated that the sacks were not level when they left Broussard and that the crosstying method utilized at the mill was itself defective. At this juncture, Nelson opined that the four by two system that Broussard utilized was not secure because it was not interlocking. Although Broussard relied on the fact that its method of stacking and crosstying had existed for years, it did not refute Nelson's expert evidence which lay blame on Broussard for the condition of the pallets of rice when it left the mill. For this reason, we find that the jury could have found evidence of fault on Broussard's part.

Reasonableness of jury's assessment of fault between Stevedores and Broussard
The seminal case on the apportionment of fault between parties is Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985). In Watson, this Court identified various factors which may influence the degree of fault assigned, including: whether the conduct resulted from inadvertence or involved awareness of the danger, how great a risk was created by the conduct, the significance of what was sought by the conduct, the capacities of the actors, whether superior or inferior, and any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson, 469 So.2d at 974.[10]
After reviewing the evidence presented to the jury, we cannot say that the jury's apportionment of fault between Broussard and Stevedores was unreasonable or not supported by the evidence. Although Broussard may not have properly crosstied and stacked the rice layers on the pallets, it was the duty of Stevedores to ascertain at the time of delivery whether the rice pallets, as received, needed remediation. Once Stevedores accepted *104 the rice pallets, it assumed complete control of that lot. Moreover, having assumed control of the rice, a jury could have reasonably concluded that Stevedores's act in stacking the poorly layered and crosstied rice pallets three high created the hazard which ultimately injured its employee, Joseph. Thus, we find that a reasonable jury could have allocated fault 72.4% to the Stevedores and 13.6% to Broussard.

Trial Court's Conditionally Granted New Trial
In the present case, we note that the trial court conditionally granted a new trial if the JNOV was reversed as permitted under LA.CODE CIV. PROC. art. 1811(C)(1), (2), but did not specify the grounds for granting the motion.[11] As provided in LA. CODE CIV. PROC. art. 1972, a new trial shall be granted, upon contradictory motion, where (1) the verdict or judgment is contrary to the law and evidence; (2) important evidence is obtained after trial; or (3) the jury was either bribed or behaved improperly.[12] Moreover, pursuant to LA. CODE CIV. PROC. art. 1973, a new trial may be granted if there is good ground therefor except as otherwise provided by law.[13]
In Lamb v. Lamb, 430 So.2d 51 (La. 1983), we set forth the standard for granting a new trial pursuant to LA.CODE CIV. PROC. art. 1973. There we stated:
A proper application of this article necessitates an examination of the facts and circumstances of the individual case. When the trial judge is convinced by his examination of the facts that the judgment would result in a miscarriage of justice, a new trial should be ordered.... We have recognized that the [trial] court has much discretion regarding this determination. However, this court will not hesitate to set aside the ruling of the trial judge in a case of manifest abuse.
Lamb, 430 So.2d at 53.
In a motion for new trial under either LA.CODE CIV. PROC. arts. 1972 or 1973, the trial court may evaluate the evidence without favoring either party; it may draw its own inferences and conclusions; and evaluate witness credibility to determine whether the jury had erred in giving too much credence to an unreliable witness. Smith v. American Indem. Ins. Co., 598 So.2d 486 (La.App. 2 Cir.), writ denied, 600 So.2d 685 (La.1992). The applicable standard of review in such matter is whether the trial court abused its discretion. Anthony v. Davis Lumber, 629 So.2d 329 (La.1993).
As we stated at the outset of this discussion, the trial court did not specify any grounds for its decision to conditionally grant the motion for new trial. In stark contrast to the procedure employed by the trial court, we point out that LA.CODE CIV. PROC. art. 1811(C)(1) mandates that the trial court specify the grounds which support its action. The evident purpose of Article 1811's requirement for specifically stated grounds for the trial court's action on the motion for new trial is to provide a reviewing court with particularized reasons with which to assess the propriety of the motion; to require anything less relegates the reviewing court to speculation. *105 A conditional grant of a new trial is not to be used to give the losing party a second bite at the apple without facts supporting a miscarriage of justice that would otherwise occur. Considering both LA.CODE CIV. PROC. arts. 1972 and 1973, and our affirmation of the trial court's JNOV as to the jury's apportionment of fault to Joseph, we neither find peremptory nor discretionary grounds upon which the trial court could have based its conditional grant of a new trial. Accordingly, we conclude that a conditional grant of a new trial on issues on which we have reversed the lower courts would constitute an abuse of discretion and reverse that ruling.
Having found that a new trial is not merited, we reinstate the jury's adjudication of 72.4% fault to Stevedore and 14% fault to Broussard. However, because we find that the lower courts properly found on JNOV review that Joseph was not comparatively at fault, we must reallocate the 14% fault which the jury assessed against him. After reviewing the Watson factors, we find that fault should be reallocated 15.5% to Broussard and 84.5% to the Stevedores.[14]

General Damage AwardManifest Error Review
Broussard takes issue with the appellate court's determination that the jury's damage award of $123,275 for physical and mental pain and suffering, past and future, loss of enjoyment of life, and permanent disability was abusively low. Although it agrees that the trial judge improperly raised the jury's total damage award under a JNOV because reasonable minds could differ on the entitlement and calculation of those damages, it nonetheless contends that the appellate court erred when it found the jury's award for these elements of damage was undeniably low. At issue then is whether the appellate court correctly raised Joseph's general damage award from $123,275 (the jury's award) to $225,000 by finding the jury's award was manifestly erroneous.[15]
Because of the exacting requirements for granting a JNOV, it is theoretically possible for a JNOV to have been improvidently granted, and yet the jury verdict may be manifestly erroneous. Drury v. American Honda Motor Co., Inc., 93-1414 (La.App. 1 Cir. 12/22/94), 659 So.2d 738, writ denied, 95-1012 (La.6/23/95), 660 So.2d 437. Because of the different analysis inherent to each, we note that there are two different standards which were in operation on the appellate level when the reviewing court examined the damage award. First, the appellate court, applying the JNOV standard enunciated in Scott and its progeny, determined that the trial judge improperly granted a substantial increase in the total damage award because reasonable minds could have differed. However, once the appellate court made that determination, we find it properly applied the manifest error rule of Coco v. Winston Indus., Inc., 341 So.2d 332 (La.1976) and its prolific progeny, when it determined that the general damage award was abusively low.
Broussard contended in its argument before the jury that Joseph's neck injury was at best a soft tissue injury, that he was a malingerer, and that he could return to work. It is evident, however, that the lower courts disagreed with Broussard's contentions in this regard.
Three physicians, Dr. John Cobb and Dr. Clark Gunderson, treating orthopedic surgeons, and Dr. William Foster, a neurosurgeon who testified in this matter, found objective evidence that Joseph injured *106 his neck when the sacks of rice fell on him at the Port and that this accident was the cause of his neck injuries. The only doctor not to find objective evidence to support Joseph's cervical problem was Dr. Jack Pennington, an orthopedist who examined Joseph once as an IME for Stevedores's compensation carrier.[16] Despite Dr. Pennington's opinion, Joseph presented objective medical findings in the form of myelograms and CT scans which showed the disc protrusions. Moreover, his treating physicians opined that more probably than not the accident at the Port was the cause of Joseph's cervical disc problems. In addition, Dr. Gunderson, the orthopedist who performed Joseph's cervical disc surgery, indicated that more cervical surgery was needed and opined that Joseph could not return to work. Finally, Dr. Foster unequivocally stated that the Port accident caused Joseph to suffer from thoracic outlet syndrome which he would either have to live with or have addressed surgically.[17] When this testimony is considered along with the unrefuted testimony that Joseph had worked successfully as a longshoreman for twenty years without physical problems, we find that the appellate court, after particularizing the facts of this injury to this plaintiff, properly found the jury's general damage award abusively low.

DECREE
For the foregoing reasons, we affirm that part of the JNOV which found Floyd Joseph free from fault. We further reverse that portion of the JNOV which held Broussard Rice Mill 100% at fault and which increased the damage award. We reinstate the jury's damage award as amended in the appellate court's judgment which increased damages to $584,485. In accordance with our findings herein, we reallocate fault 15.5% to Broussard Rice Mill and 84.5% fault to Lake Charles Stevedores.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED AS AMENDED.
JOHNSON, J., concurs in part and dissents in part and assigns reasons.
VICTORY, J., subscribes to the opinion and assigns additional reasons.
JOHNSON, J., concurring in part and dissenting in part.
I agree with the majority that the jury erred in assigning any percentage of fault to plaintiff, Floyd Joseph. Clearly, this worker was doing the task assigned. There is no evidence that he created or contributed to this dangerous situation. Nor is there any evidence that he performed this task in a negligent fashion.
I disagree with the majority's conclusion as to the apportionment of fault between Broussard Rice Mill, Inc. and the Lake Charles Stevedores. From all the evidence, reasonable minds can only conclude that Broussard was responsible for glueing and stacking the rice and that Broussard failed in its duty to properly glue and stack the rice sacks before they left the rice mill on pallets. The lower courts were correct to assign the greater percentage of fault to Broussard because of this active negligence. The fault of the Stevedores in failing to notify Broussard of its own negligence pales by comparison, and I would assign 85% negligence to Broussard and 15% negligence to the Stevedores.
VICTORY, J. (assigning additional reasons).
While I subscribe to the majority opinion, I write separately to note that this *107 Court has never squarely addressed the issue of awarding hedonic damages for loss of enjoyment of life as a separate element of damages. While damages for "loss of enjoyment of life" were recited as part of the jury's total award in this case, and as amended by the appellate court, no party assigned error to the award of damages for loss of enjoyment of life. Nor did this Court grant certiorari in this case to consider that issue.
NOTES
[1] Crosstying the sacks involves stacking them on the pallets so that each layer of sacks lies in a different configuration than the layers directly above and below. Broussard used a four and two method of crosstying. On one layer four sacks faced the same direction and two sacks faced another direction; on the next layer, the position of the sacks was reversed.
[2] Originally, Joseph also sued Farmers Rice Mill (Farmers). After it was learned in discovery that Farmers had not bagged and transported the rice stacks that fell in the warehouse, Joseph voluntarily dismissed it from the lawsuit.
[3] Although Stevedores was not made a party to the lawsuit, the jury considered the fault of Stevedores pursuant to LA. CIV.CODE art. 2323 which allows a jury to consider the fault of a non-party. In this case, Stevedores was the non-party employer of Joseph.
[4] The jury awarded $68,245 for past and present medical expenses; $35,181 for future medical expenses; $71,400 for loss of past wages; $184,659 for loss of future earning capacity; $96,000 for pain and suffering and loss of enjoyment of life; and $27,275 for permanent disability.
[5] The intervenors, Stevedores and their insurer, Mutual, also filed a motion for judgment notwithstanding the verdict. In the trial court, they announced their alignment with the arguments advanced by Joseph.
[6] The trial judge increased the jury award for loss of past wages from $71,400 to $100,683; raised the award for loss of future earning capacity from $184,659 to $332,634; raised the jury award of $96,000 for physical and mental pain and suffering, past and future, as well as for loss of enjoyment of life to $400,000; and increased the jury award of $27,275 for permanent disability to $75,000. The trial judge further conditionally granted Joseph's motion for new trial if the appellate court reversed the JNOV.
[7] In its jury instructions, the trial court told the jury, as follows: "If you conclude that the plaintiff's conduct in this incident was a deviation from the conduct we would normally expect of a reasonably prudent person and that his conduct helped to cause his injury, then you must assign a percentage of responsibility to the plaintiff according to the instructions I will give you." In the present case, there was no showing that Joseph's conduct was abnormal or that his conduct caused his injury.
[8] Although Gary Nelson, Joseph's safety expert, testified that the accident would not have happened had the pallets remained stacked only one pallet high, he did not state that three-high stacking was inherently dangerous. We note that Broussard presented no expert testimony of its own. It begs the question to rely on Nelson's statement that had the Stevedores not stacked the rice three pallets high, the accident would not have happened. This is so because a single pallet of stacked rice sacks is only approximately five feet high; thus, no situation would have existed for rice sacks to fall on Joseph.
[9] There was no direct evidence presented on the question of gluing. None of the sacks of rice which fell on the day of the accident were entered into evidence and there were no photographs of the accident scene as it appeared on the day of Joseph's accident.
[10] As noted in Watson, Section 2(b) of the Uniform Comparative Fault Act (as revised in 1979) provides: "In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed." Watson, 469 So.2d at 974.
[11] "C. (1) If the motion for a judgment notwithstanding the verdict is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed and shall specify the grounds for granting or denying the motion for a new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment.

(2) If the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court orders otherwise." (emphasis added).
[12] In essence, the provisions of LA. CODE CIV. PROC. art. 1972 constitute the peremptory grounds for a motion for new trial.
[13] LA.CODE CIV. PROC. art. 1973 provides the trial court with discretionary authority for the grant of a new trial.
[14] In reaching this conclusion, we reallocated fault by sharing Joseph's 14% fault in the proportions the jury assessed to Stevedores and Broussard, respectively.
[15] We note the arithmetical error highlighted in Broussard's brief to this Court. For purposes of clarification, we amend the appellate court's decree of total damages from $585,484 to the proper amount, $584,485. Our decree recognizes the correct amount of the total judgment.
[16] Although Broussard presented limited testimony from Scott Duplechain and Cheryl Trosclair, two physical therapists who worked with Joseph, as to the onset of Joseph's neck pain, we cannot say that this evidence out-weighed that of the treating physicians and of Joseph himself.
[17] Dr. Foster described the thoracic outlet syndrome surgery as a brutalizing procedure.